# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _1:17-cv-01797_____

THE COLORADO COALITION FOR THE HOMELESS, a Colorado Nonprofit Corporation


      Plaintiff,

v.

GENERAL SERVICES ADMINISTRATION,

And

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,

      Defendant(s).

---

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

Pursuant to Rules 65(a) and (b) of the Federal Rules of Civil Procedure, Plaintiff moves

this Court for entry of a temporary restraining order and for a preliminary injunction.

                                   John Parvensky
                                   *Attorney*
                                   3225 Wyandot Street
                                   Denver, CO 802112
                                   Telephone: (303) 285-5204
                                   E-mail: jp@coloradocoalition.org
                                   Attorney for (Plaintiff) The Colorado
                                   Coalition for the Homeless

## RULE 7.1 CERTIFICATE

1.      Pursuant to D.C. Colo.L.Civ.R 7.1, John Parvensky, counsel for Plaintiff, reached out to HUD Associate Counsel Nancy Christopher, counsel for Defendant HUD and GSA Senior Assistant Regional Counsel, counsel for Defendant GSA, via email informing both of Plaintiff's intent to file a Complaint for Declaratory and Injunctive Relief and a Motion for Restraining Order and Preliminary Injunction.   Due to the urgency and exigency of the underlying dispute, i.e. the scheduled auction by Defendant of the property in dispute on this date, July 25, 2017, Plaintiff is compelled to proceed with the filing of this motion without response of counsel for defendants.

**NOTICE OF FILING OF MOTION FOR TEMPORARY RESTRAINING ORDER**

2.      Counsel for Plaintiff, John Parvensky, contacted HUD Associate Counsel Nancy Christopher, counsel for Defendant HUD and GSA Senior Assistant Regional Counsel, counsel for Defendant GSA, via email and provided copy of Complaint and Motion for Temporary Restraining Order and Preliminary Injunction on July 25, 2017.

## BACKGROUND

3.      This motion is in support of the civil action for declaratory and injunction relief pursuant to a complaint filed on this date to prevent immediate and irreparable harm to Plaintiff The Colorado Coalition for the Homeless ("CCH") and its clients.  CCH is a Colorado nonprofit corporation that has filed a complaint against the General Services Administration ("GSA") and the United States Department of Housing and Urban Development ("HUD") for violating its statutory and regulatory requirements pursuant to 42 U.S.C. § 11301 *et seq.,* § 11411 et seq., Title V of the Stewart B. McKinney Homeless Assistance Act ("McKinney Act), requiring that

HUD identify and publish lists in the Federal Register of excess or surplus buildings and properties that are suitable for use to assist the homeless, and make its determination of suitability of such properties for homeless use.

4. The GSA owns and manages the Denver Federal Center, an approximately 670 acre site in the area near 6th Avenue and Kipling Street surrounded by the City of Lakewood, Colorado. Included within this site is an approximately 59.049 acre portion of the site known as the Federal Center Station property situated in the northwestern corner of the Denver Federal Center (the "Surplus Property"). This site is vacant, other than road improvements.

5. GSA has scheduled a sale of the Surplus Property via online auction beginning at noon on July 25, 2017.

6. Plaintiff contends that GSA and HUD have failed to comply with federal law governing the disposition of surplus federal property pursuant to Title V of the Stewart B. McKinney Homeless Assistance Act ("McKinney Act), 42 U.S.C. § 11301 *et seq.,* § 11411 et seq.

7. Plaintiff further contends that GSA and HUD failed to appropriate comply with federal regulations governing the assessment of surplus federal property and the determination of its suitability for use to assist the homeless as required by 24 CFR § 581.4 et.seq.

8. In this motion, Plaintiff asks this Court for an emergency temporary restraining order and a preliminary injunction to immediately enjoin GSA from continuing with its auction, sale and disposition of the Surplus Property until HUD re-evaluates its determination of suitability of the subject property for use to assist the homeless based on an evaluation and review of all relevant environmental records and reports in the position of GSA and the Colorado Department of Public Health and Environment ("CDPHE").

9.      Plaintiff further asks this Court for an order requiring HUD to re-evaluate its determination of unsuitability of the subject property for use to assist the homeless based on an evaluation and review of all relevant environmental records and reports in the posession of GSA and CDPHE.

## STATEMENT OF FACTS

10.     Plaintiff, The Colorado Coalition for the Homeless ("CCH"), is a nonprofit corporation organized under the laws of the state of Colorado, whose mission is to work collaboratively toward the prevention of homelessness and the creation of lasting solutions for homeless individuals and families throughout Colorado.  CCH provides integrated health care, supportive housing, emergency assistance, counselling and support to more than 15,000 unique homeless and at-risk families and individuals each year.  CCH also represents homeless families and individuals who are negatively affected by the action of Defendants failure to follow the legal and regulatory requirements of Title V of the McKinney Act.

4.      Defendant General Services Administration is an agency of the United States government which owns and manages real estate assets of the United States including the Denver Federal Center in Lakewood, Colorado and a 59 acre parcel known as the Federal Center Station property it intends to sell by auction on July 25, 2017.

5.      The United States Department of Housing and Urban Development is an executive department of the United States Government whose responsibilities include screening surplus federal properties to determine their suitability for use to assist the homeless pursuant to Title V of the McKinney Act 42 U.S.C. § 11411 *et seq.*

6. Plaintiff filed a complaint on July 25, 2017 pursuant to pursuant to Title V of the Stewart B. McKinney Act 42 U.S.C. § 11411 *et seq.* and the Administrative Procedures Act ("APA") 5 U.S.C. § 706 based on defendants' arbitrary and capricious action in their failure to appropriately screen and determine the suitability of surplus real estate property owned and managed by the General Services Administration in violation of Act 42 U.S.C. § 11411 *et seq.* and HUD's regulations under 45 Part 12a *et seq.*

7. The failure of HUD and GSA to follow the requirements of Title V of the McKinney Act has deprived Plaintiff the opportunity to use the subject Property to assist and benefit thousands of homeless families and individuals by providing supportive housing, shelter, employment, services and other supports on the GSA surplus property and such failure will cause serious and irreparable harm to Plaintiff and the thousands of homeless families and individuals it serves, or could serve, but for HUD and GSA's failure to comply with the law and regulations.

8. The Denver Federal Center is an approximately 670 acre site owned and managed by the GSA in an area near 6th Avenue and Kipling Street surrounded by the city of Lakewood, Colorado. The Denver Federal Center provides office, warehouse, and other space for the benefit of 26 different federal agencies on the site. Included within this site is an approximately 59.049 acre portion of the site known as the Federal Center Station property situated in the northwestern corner of the Denver Federal Center (the "Surplus Property"). This site is vacant, other than road improvements.

9. In 2015 and 2016, GSA negotiated with the City of Lakewood to transfer the Surplus Property to the City of Lakewood in exchange for the City's building of a lab at the Federal Center site. According to City documents and news accounts, Lakewood would then sell off

pieces of the Surplus Property to developers with the intention that it be built out as part of a comprehensive plan complete with residential, retail and office space adjoining the Regional Transportation District rail station adjacent to the Surplus Property.

10.     In 2016, the City of Lakewood decided not to move forward with the exchange of the Surplus Property, and the GSA decided to place the Surplus Property of the market through its auction process.

11.     As required by Title V or the McKinney Act, GSA notified HUD sometime in mid-2016, pursuant to HUD's required canvass of landholding agencies of unutilized, underutilized, excess or surplus properties under Section 12a.3 (a), that the Surplus Property was excess and surplus and subject to HUD's assessment of its suitability.

12.     On September 23, 2016, HUD published in the Federal Register a notice that the Surplus Property (HUD No. 5401630010) was "unsuitable" for use as facilities to assist the homeless. The Notice cited "hazardous constituents at concentrations exceeding residential/unrestricted use levels; clear threat to personal safety". Federal Register Volume 81, Number 185, pages 65665-65667.

13.     On September 29, 2016, Plaintiff "appealed" HUD's determination of unsuitability through its process of emailing its request that HUD review its determination. Plaintiff noted that 1) given the size of the site, 2) that only a portion of the property may have exposure to hazardous materials, and 3) that the GSA had been negotiating a transfer of the property to the City of Lakewood for redevelopment of mixed uses, including residential use, a determination by HUD that the property was unsuitable for use to assist the homeless was inaccurate and inappropriate.

14. On November 1, Ann Marie Oliva, Deputy Assistant Secretary of Special Needs responded to Plaintiff by letter upholding HUD's decision that the property was unsuitable "due to the landfill located on this property with high concentrations of polycryclic aromatic hydrocarbons, metals, dioxin/furans, pesticides, and asbestos that are a threat to physical safety".

15. On October 13, 2016, Plaintiff wrote to Mr. Flavio Peres, Office of Real Property Utilization and Disposal at GSA requesting, among other things, "1. Environmental reports and other documents describing, addressing, discussing: a. Contamination(s) in structures (if applicable), b. Contamination(s) in the soils, 2. Past and present and/or planned mitigation efforts, 3. Documents and information pertaining to the source of the contamination , 4. Site Plan showing the location of contamination(s) impacting the property, a. Location of tests with results, b. Source of contamination, c. Subsoil drainage patterns, direction and flow, and 5. Site Plan showing existing structures and/or uses of the property. The purpose of this request was for Plaintiff to assess whether there was any basis for the determination made by GSA and HUD that the property was "unsuitable" due to contaminates identified in Oliva's letter.

16. Plaintiff never received a response to its request from GSA.

17. On July 1, 2017, Plaintiff discovered a sign located on the Surplus Property indicating that the 59 acre parcel was for sale by the GSA. Upon further review, Plaintiff found the property listed for auction scheduled for July 25, 2017 on GSA's website https://www.gsa.gov/portal/content/152190.

18. The GSA Invitation for Bids on the Surplus Property (listed as IFB Number GSA-R-1849) included a number of documents, including environmental documents maintained by the Colorado Department of Public Health and Environment ("CDPHE"), a "Corrective Action Plan for Post Corrective Measures Operation and Maintenance of the Northwest Corner Landfill

7

Cover Formerly Part of the Denver Federal Center, Lakewood Colorado" ("CAP") required to be completed by the successful bidder, and an Operations and Management Plan ("O&M Plan) dated March 2017 documenting the procedures required to be followed for the development of the Surplus Property on areas determined by CDPHE and GSA that needed to be addressed by any future prospective purchaser of the Surplus Property.

18.  Among other things, the O&M plan indicated that there were only two areas on the 59 acre Surplus Property site, consisting of a total of 15 acres, that contained landfills that has been capped in compliance with CDPHE regulations and that were subject to limited use restrictions that required approval of CDPHE prior to any future development that would disturb this portion of the site. O&M Page 2.2.  Alternatively, these areas could be remediated to meet "residential/unrestricted use criteria". O&M Page 2.2.  Otherwise, these covered landfills would need to be inspected and monitored.  O&M 3.1.  The O&M plan provided additional guidance on the excavation and removal of any soil within the footprint of the Landfill Cover area.

19.  The O&M plan stated that "CDPHE has determined that excavated soil and waste from within the footprint of the NW Corner Landfill Cover area may be reused within the existing footprint of the NW Corner Landfill Cover as long as the reuse activity does not adversely affect human health or groundwater and it is properly covered after relocation. Additionally, if the soil or waste to be reused onsite contains RACS then the requirements in Section 5.5.8(B) of the Solid Waste Regulations (6 CCR 1007-2, Part 1) must be met. No waste or contaminated soil shall be used as backfill over or adjacent to structures or utilities. Relocated waste and/or contaminated soil must be covered in accordance with Section 5.3 of this O&M Plan". O&M 5.1.

8

20. The O&M Plan further described the conditions upon which the Surplus Property, including the Covered Landfill areas, could be developed for any use.

21. In a letter dated February 14, 2017 from CDPHE to the City of Lakewood Planning Department, David Walker, CDPHE's project manager for the Denver Federal Center, confirmed that GSA provided CDPHE a copy of the Restrictive Notice for the covered landfill portion of the Surplus Property. Mr. Walker stated that "**One thing to note is that there is no restriction of the type of development that may occur in the Northwest Corner Sale Area property in general, or the NW Corner Landfill Cover property in particular**. (Emphasis added). CDPHE Letter page 2. The letter further noted that O&M Plan must be followed when "redeveloping the landfill area to ensure protection of human health during and after construction." Id.

22. On July 21, 2017, Plaintiff requested HUD to reconsider its determination of "unsuitability" for homeless use based on the documents included in the GSA Invitation for Bids. To date, HUD has not responded to Plaintiff's request.

23. Plaintiff now requests the Court to enjoin Defendant GSA from proceeding in its actions to dispose of the subject property to the highest bidder in violation of Title V of the McKinney.

24. Plaintiff further requests the Court to order Defendant HUD to re-assess the subject property for suitability under the criteria established in federal regulations at 24 CFR § 581.6.

## ARGUMENT

### I. Legal Standard For Interim Injunctive Relief

The Tenth Circuit applies a four-prong test in evaluating whether an interim injunction is warranted. The moving party must generally demonstrate "(1) a likelihood of success on the

merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). The Plaintiffs here easily satisfy this test.

**II. Plaintiffs are Substantially Likely to Succeed on the Merits**

Plaintiff has alleged in its complaint and referenced public documents in the possession of Defendant GSA that the subject property is 1) being marketed for sale for a Transit Oriented Development that includes residential, office and retail use, despite the presence on the site of a covered landfill, and 2) the Colorado Department of Public Health and Environment has publicly stated to GSA and potential purchasers that the property "**that there is no restriction on the type of development that may occur in the Northwest Corner Sale Area property in general, or the NW Corner Landfill Cover property in particular**"

This action by GSA and the representations by the environmental regulatory agency in Colorado governing the site that there are no restrictions on the type of development that may occur on the subject property is in direct contradiction to HUD's determine that the property is "unsuitable" for use to assist the homeless.

Federal regulations governing the determination of suitability of use of excess or surplus federal property are clearly outlined in 24 CFR § 581.6. This section clearly delineates the criteria for HUD's determination of suitability of a property for use to assist the homeless. Section 581.6 states that "All properties, buildings and land will be determined suitable unless a property's characteristics include one or more of the following conditions:", and the regulation proceeds to list six conditions that would prevent a determination of suitability: 1) National

10

Security Concerns, 2) Property containing flammable or explosive materials, 3) Runway clear zone and military airfield clear zone, 4) Floodway, 5) Documented deficiencies, and 6) Inaccessibility. The subject property is not impacted by criteria 1, 2, 3, 4, or 6.

HUD based its determination of "unsuitability based on 24 CFR § 581.6 (a)(5) Documented deficiencies. This section provides:

> **(5)** *Documented deficiencies.* A property with a documented and extensive condition(s) that represents a clear threat to personal physical safety will be determined unsuitable. Such conditions may include, but are not limited to, contamination, structural damage or extensive deterioration, friable asbestos, PCB's, or natural hazardous substances such as radon, periodic flooding, sinkholes or earth slides.

HUD specifically relied on GSA's representation that the property was unsuitable "due to the landfill located on this property with high concentrations of polycryclic aromatic hydrocarbons, metals, dioxin/furans, pesticides, and asbestos that are a threat to physical safety".

HUD did not provide any analysis as to whether the presence of the landfill on the property created a "threat to physical safety" as required by 24 CFR §581.6 (a)(5).

If HUD had reviewed the entire environmental record in GSA's possession, it would have concluded that the presence of a landfill on the site did not indeed present a threat to physical safety. If GSA had notified HUD as required by regulation that it intended to dispose of the property through sale with its own representations and that of CDPHE that there was no restriction on the type of development that may occur on the subject site, **including the NW Corner Landfill Cover property,** HUD should have concluded that the property was indeed suitable for use to assist the homeless.

11

24 CFR § 581.6 (a)(5) creates a presumption of suitability unless one or more of the listed conditions therein are met. Given the environmental record that demonstrated that the existing landfill on the site did not create a restriction on any type of development on the property, including mixed use residential, office and retail uses for non-homeless persons, the determination by HUD that the property was unsuitable for use to assist the homeless was arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 702.

HUD has maintained that the information provided by GSA indicating that a portion of the subject property contained a landfill with toxic materials that created a threat to physical safety. However, HUD failed to consider the fact that only a portion of the site, 15 acres out of the 59 acre site, contained a landfill which HUD considered a potential threat to physical safety. Notwithstanding the fact that the environmental record demonstrates that the presence of the landfill did not create restrictions on the development of the property, including on the landfill, HUD erred in determining that the presence of a landfill on a portion of the site rendered the entire site "unsuitable".

A clear reading of the suitability criteria under 24 CFR §581.6 (a) demonstrates that an unsuitable condition on a portion of a surplus property should not render the whole site unsuitable. For example, 24 CFR §581.6 (a) (2) provides that "Underground storage, gasoline stations and tank trucks are not included in this category and their presence **will not be the basis of an unsuitability determination unless there is evidence of a threat to personal safety** as provided in paragraph (a)(5) of this section." (emphasis added). A capped landfill, representing a portion of the subject site, is similar to an underground storage site, and should have led HUD to a determination of unsuitable only if there is evidence of a threat to personal safety. HUD did not

make any specific finding or present any evidence that there was a treat to personal safety created by the landfill on the property.

Similarly, §581.6 (a) (4) provides that "if only an incidental portion of the property not affecting the use of the remainder of the property is in the floodway, the property will not be determined unsuitable." This subsection reinforces that the presence of an unsuitable condition on only a portion of the property should not make the remainder of the property unsuitable.

HUD and GSA have a long history of preventing excess, surplus, and unutilized federal property from being deemed suitable and available for use to assist the homeless. HUD, GSA and other federal agencies are under a continuing injunction and order requiring affirmative action in meeting the requirements of Title V of the McKinney Act. (See Nat'l Law Ctr. On Homelessness & Poverty v. U.S. Veterans Admin. (819 F. Supp. 69 (D.D.C.1993) and 842 F. Supp.2d at 129, 131.

The failure of HUD to issue a finding of suitability of the subject property for use to assist the homeless, and GSA's failure to submit full environmental information to HUD documenting the suitability of the property for use to assist the homeless, notwithstanding the presence of a remediated landfill on the site, demonstrate arbitrary and capricious actions and decisions by both defendants which create irreparable harm to Plaintiff and its clients.

## III. Plaintiff Will Suffer Irreparable Injury if An Interim Injunction is Denied

As a general rule, a "plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).

The actions of Defendants to deny a determination of suitability of use to assist the homeless, and Defendant GSA's sale of the subject property to a party that will not develop it for use to assist the homeless, removes a property that Plaintiff can develop to assist the homeless forever, reducing Plaintiff's ability to provide needed supportive housing, shelter, or services to homeless families in desperate need. Such a denial creates an injury to Plaintiff and its clients for which monetary remedies would not redress.

While there is no guarantee or right of Plaintiff to acquire the subject property if HUD determines it to be suitable for use to assist the homeless, since there is an application process open to other agencies in the community serving the homeless, the inability of Plaintiff to even have an opportunity to submit an application to use the property for this purpose constitutes an irreparable harm to Plaintiff that cannot be remedied with monetary damages. Plaintiff meets the requirements under Title V of the McKinney Act and its implementing regulations, has demonstrated capacity to develop supportive housing and facilities to assist the homeless, and has the financial wherewithal to develop such facilities creates a significant likelihood that Plaintiff would be chosen to develop the subject property to assist the homeless if the proper determination of suitability is made by HUD and GSA disposes of the property in accordance with applicable regulations.

## IV. The Balance of Equities Favors Plaintif

In this case, the balance of equities clearly favors the Plaintiffs. Homelessness is a significant and growing problem in the Metro Denver area, with more than 5,400 individuals, including men, women and children experiencing homelessness each night, and more experiencing homelessness through the course of the year. (See Point in Time Count, Metro

Denver Homelessness Initiative, 2016). Experiencing homelessness creates significant trauma, creates and exacerbates health and mental health conditions, and subjects homeless individuals to arrest and jail based on homeless status alone. Any action taken to reduce homelessness and its impact of homeless families and individuals reduce unnecessary costs to the social service and criminal justice system, and reduces trauma and pain to those experiencing homelessness.

On the other hand, a delay in the disposition of the subject property while HUD re-evaluates its determination of suitability of use of the property to assist the homeless would not cause significant harm to GSA.

## V. The Injunction is in the Public Interest.

The temporary injunction Plaintiff seeks is clearly in the public interest. If Plaintiff prevails in its action, it will create the condition that an excess and surplus property held by the federal government will be available to be developed to provid critically needed supportive housing, health care, employment, and support services to homeless families and individuals.

In addition, if Plaintiff's action reverses a violation of federal law and regulation by Defendant's HUD and GSA, the public interest will be served by this remedy.

Case 1:17-cv-01797-REB-MJW Document 12 Filed 07/26/17 USDC Colorado Page 15 of 17

## CONCLUSION

For the foregoing reasons, the motion for a temporary restraining order and preliminary injunction should be granted. The Court should enjoin GSA from disposing of the subject property through its auction or other sale process, and require HUD to re-evaluate the suitability of the property in accordance with the updated environmental information concerning the site and in accordance with the requirements of Title V and its implementing regulations.

Respectfully submitted this 25th day of July, 2017.

    s/ John Parvensky
    *Attorney*
    3225 Wyandot Street
    Denver, CO 802112
    Telephone: (303) 285-5204
    E-mail: jp@coloradocoalition.org
    Attorney for (Plaintiff) The Colorado Coalition for the Homeless

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2017, I electronically filed the foregoing

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND

PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system and by email

and undersigned counsel will send notification of such filing to the following recipients:

HUD Associate Counsel Nancy Christopher, counsel for Defendant HUD

nancy.christopher@hud.gov

and

Mark Duffy, GSA Senior Assistant Regional Counsel, counsel for Defendant GSA

Mark.Duffy@gsa.gov

*s/ John Parvensky*

_____

John Parvensky
Attorney